IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

HEATHER RUTECKI,

               Plaintiff,

v.                                  CIVIL ACTION NO.  5:05-cv-00226

CSX HOTELS, INC., dba
The Greenbrier Resort,

               Defendant.

**MEMORANDUM OPINION**

     Pending before the Court is the Motion for Summary Judgment [Docket 35] of Defendant

CSX Hotels, Inc., d/b/a The Greenbrier Resort ("Greenbrier").  For the reasons stated below, the

Greenbrier's motion is **GRANTED**.[1]

**I.**      **BACKGROUND**

     Prior to September 12, 2004,[2] Plaintiff Heather Rutecki, a Florida citizen, made a reservation

to stay at the Greenbrier in White Sulphur Springs, West Virginia.  Rutecki Dep. at 78.  At the same

time Plaintiff made her reservation, she also made a reservation to go horseback riding at the

Greenbrier.[3]  *Id*. at 72.  On the morning of September 13, 2004, Plaintiff arrived at the office of

Kate's Mountain Outfitters in the lobby of the Greenbrier, where she informed the employee

---

[1] Accordingly, the Greenbrier's motions to dismiss [Docket 197 & 201] are **DENIED AS MOOT**.

[2] The exact date is not clear from the record.

[3] Plaintiff testified that when she arrived at the Greenbrier, she proceeded to cancel her originally scheduled horse ride for September 12, but rescheduled her riding reservation for September 13. Rutecki Dep. at 72-73.

working behind the counter that she had a reservation for a "group" horseback ride.[4]  *Id*. at 84.  The employee advised Plaintiff that no such reservation could be located.  *Id*.  However, after the employee contacted a groom in the Greenbrier's stable, Mr. Diem, she was able to arrange for Plaintiff to take a private ride with Mr. Diem as her guide.  *Id*. at 86.  Even though Plaintiff wanted a group ride because she said she "would feel safe," Plaintiff accepted.  *Id*. at 87.

Mr. Diem, having just completed a carriage ride with another group of individuals, walked over to the riding circle – where the riding horses were located – and selected a horse for Plaintiff.  Diem Dep. at 39.  Mr. Diem was given his horse, Thunder, by another groom who had recently completed a private ride.[5]  *Id*.  The record is unclear as to whether, prior to Plaintiff mounting her horse, Mr. Diem was informed of her riding capability.[6]  As Mr. Diem was preparing for his ride with Plaintiff, she was in the office and was given a riding helmet and told that her guide would be

---

[4] The types of rides offered at the Greenbrier are carriage rides, group rides, lessons, and private rides.  Diem Dep. at 15.

[5] Mr. Diem had never ridden Thunder prior to September 13, 2004.  Diem Dep. at 29.

[6] In Mr. Diem's deposition, he states that he picked the horse named Trump for Plaintiff "because she said she had ridden."  Diem Dep. at 40.  However, when asked whether he "specifically ask[ed] [Plaintiff] what her level of experience was, whether she had ridden before . . .", Mr. Diem responded, "I feel sure I did, that's something we do on a regular basis, you know, that's one of the first questions."  *Id*. at 68.  Contrary to what Mr. Diem stated, Plaintiff testified to the following during her deposition:

> Q:   Had you at any point yet advised [Mr. Diem] whether you did or did not have
>       any experience on a horse?
> A:   We had no conversation.  He just put me up.

Rutecki Dep. at 115.

However, Plaintiff stated that when she originally called for her riding reservation from Florida that it was "possible" that she told the Greenbrier she had ridden before.  *Id*. at 74.  Thus the record is unclear as to whether Mr. Diem knew Plaintiff had ridden prior to selecting her horse.  Of course, the evidence must be taken in the light most favorable to the non-movant.

waiting for her outside.  Rutecki Dep. at 89-90.  According to Plaintiff, she walked outside, greeted

Mr. Diem, and was about to mount her horse, Trump,[7] when the employee in the office asked her

to come back inside and sign what Plaintiff testified the employee referred to as a "sign in" sheet.

*Id.* at 93.  Plaintiff went back inside the office and executed "The Greenbrier Notice, Release and

Indemnification."[8]  The Notice, Release and Indemnification required Plaintiff to print her name and

sign the third page, which she did.  *Id*. at 98-99.  However, the document also had a column for

Plaintiff to indicate her riding ability, which she failed to do.  *Id*. at 98.

After she printed her name and signed the Notice, Release and Indemnification, Plaintiff

went back outside, mounted her horse, and began her ride.  *Id*. at 112-15.  Shortly after beginning

---

[7] According to Mr. Diem, "Trump was a horse that [the Greenbrier] normally use[d] for private rides.  He was a good all around horse.  If people could ride, that was fine.  He responded well if they just wanted to walk.  Trump had no problem with just walking."  Diem Dep. at 40.  The Greenbrier also suggests in its memorandum that "Trump has been ridden as a guest horse without injury for upwards of ten (10) years."  Def.'s Reply in Supp. of its Mot. for Summ. J., at 13 (citing Diem Dep. at 18, 46).

[8] Plaintiff testifies that she only saw the third page of the Notice, Release and Indemnification.  Rutecki Dep. at 94.  Even so, she was presented with and signed the page that had the headline "Notice, Release and Indemnification."  This page also included the following paragraph:

> I have read and understand this Notice, Release and Indemnification and I hereby acknowledge that West Virginia law governs my participation in this activity.  In addition and not in limitation of the foregoing, I hereby assume all the risk of participating in an equestrian activity provided by The Greenbrier and release and will hold harmless The Greenbrier, its officers, employees and agents, from any and all liability, actions, causes of actions, debts, claims and demands of every kind and nature whatsoever which I now have or which I may have arising out of or in connection with my participation in equestrian activities provided by The Greenbrier.  My signature hereon shall serve as a release, indemnification and assumption of the risk on behalf of myself, my heirs, executors and administrators and for and on behalf of any minors accompanying [sic] me.

Def.'s Resp. to Pl.'s Supplemental Reply to Def.'s Mot. for Summ. J., at Ex. D.  It is also worth noting that the page Plaintiff signed indicated on its face that it was the third page.

the trail portion of the ride, Mr. Diem's horse balked at something it either saw or thought it saw, and then went up a bank and turned suddenly.  Diem Dep. at 50.  Mr. Diem tried to gain control of Thunder by what Plaintiff described as "wrestling" and "whipping" his horse.  Rutecki Dep. at 135. However, Mr. Diem was unable to control the horse, lost his balance, and was forced to jump clear of the animal.  Diem Dep. at 51.  Plaintiff's horse, apparently disturbed by Thunder's reaction, turned quickly and ran, causing Plaintiff to fall and severely injure her back.  Rutecki Dep. at 137-38.

On March 17, 2005, Plaintiff filed a three-count complaint against the Greenbrier alleging negligence, liability for breach of the duties set forth in the West Virginia Equestrian Activities Responsibility Act, W. VA. CODE §§  20-4-1 to 20-4-7 ("the Act"), and gross negligence. Specifically with regard to liability under the Act, Plaintiff alleged that the Greenbrier failed to:

a)   Make reasonable and prudent efforts to determine the ability of [Plaintiff] to safely engage in the equestrian activity at issue herein;
b)   Determine the ability of [Plaintiff] to safely manage, care for and control the particular horse involved in this accident;
c)   Make known to [Plaintiff] any dangerous traits or characteristics or physical impairments or conditions related to any of the horses involved in this accident which the Greenbrier knew or should have known;
d)   Present to [Plaintiff] for her inspection and signature, a statement which clearly and concisely explained the liability limitations, restrictions, and responsibilities set forth in WV Code § 20-4-1, *et. seq* [sic].

Compl. ¶ 23.

The damages sought by Plaintiff included amounts for severe physical and emotional injury, pain and suffering, medical bills and expenses, lost earnings, lost earning capacity, embarrassment and humiliation, scarring, and loss of enjoyment of life.  *Id*.  ¶¶ 21, 25, 28.

On May 26, 2006, the Greenbrier filed a motion for summary judgment. Plaintiff, at the time proceeding *pro se*,[9] filed a response on July 12 and a supplemental response on July 13. The Greenbrier filed its reply on July 21, and Plaintiff, without the leave of court required by LR CIV. P. 7.1(c), filed a surreply on July 24. After nearly three months of proceeding *pro se*, Plaintiff obtained counsel on September 14, 2006. The Court held a Status Conference on December 12, 2006, at which time it permitted Plaintiff's counsel to file a supplemental brief in opposition to the Greenbrier's motion. The Court also permitted the Greenbrier to respond.

At the Status Conference, both parties informed the Court that they wished to proceed to trial set for January 17, 2007. Pursuant to the parties' representations, the Court denied Plaintiff's outstanding Motion to Stay and to Modify the Second Amended Scheduling Order [Docket 85], which was filed on September 14, 2006. According to the Second Amended Scheduling Order, Plaintiff's expert disclosures should have been filed by September 14, 2006. On October 26, the Greenbrier filed a Motion to Strike Plaintiff's Expert Witnesses [Docket 132]. Following the Status Conference and the denial of the Motion to Stay and to Modify the Second Amended Scheduling Order, Magistrate Judge VanDervort entered an Order granting the Greenbrier's Motion to Strike Plaintiff's Expert Witnesses [Docket 200]. On January 11, 2007, Plaintiff appealed the Magistrate Judge's ruling as to the equine expert and attached a report of her proposed equine expert to her appeal. On January 12, 2007, the Court affirmed the Magistrate Judge's exclusion of this expert. Plaintiff provided the Court with no expert testimony in response to the Greenbrier's motion for

---

[9] Plaintiff's original counsel filed a motion to withdraw on June 8, 2006, which was granted on June 28, 2006. The Court notes that throughout the course of this litigation, Plaintiff was a practicing attorney in Florida.

summary judgment and now, as a result of the Court's affirmance of Magistrate Judge VanDervort, she cannot.

## II.     APPLICABLE LAW

### a.  Summary Judgment Standard

Summary judgment is proper where the pleadings, depositions, and affidavits in the record show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant."  *Am. Safety Indem. Co. v. Stollings Trucking Co.*, 450 F. Supp. 2d 639, 642 (S.D. W. Va. 2006) (Copenhaver, J.) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248  (1986)).  In other words, "[a] party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-moving party."  *Id*. (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

The party requesting summary judgment bears the initial burden of showing the absence of any genuine issues of material fact.  *See Celotex Corp.*, 477 U.S. at 322-23.  "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact."  *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991), *cert. denied*, 502 U.S. 1095 (1992) (citing *Anderson*, 477 U.S. at 247- 48).  "A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his [or her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  Furthermore, "the plain language of Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who *fails to make a showing sufficient to establish the existence of an element essential to that party's case*, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322 (emphasis added).

### b. The West Virginia Equestrian Activities Responsibility Act

The West Virginia Equestrian Activities Responsibility Act "recognize[s] that there are inherent risks in equestrian activities which should be understood by participants therein and which are essentially impossible for the operators of equestrian businesses to eliminate . . . ." W. VA. CODE § 20-4-1. The purpose of the Act is "to define those areas of responsibility and those affirmative acts for which the operators of equestrian businesses shall be liable for loss, damage or injury suffered by participants, and to further define those risks which the participants expressly assume and for which there can be no recovery." *Id*. The duties of horsemen, as the term is defined in § 20-4-2,[10] are to:

> (1) Make reasonable and prudent efforts to determine the ability of a participant to safely engage in the equestrian activity, to determine the ability of the horse to behave safely with the participant, and to determine the ability of the participant to safely manage, care for and control the particular horse involved;
>
> (2) Make known to any participant any dangerous traits or characteristics or any physical impairments or conditions related to a particular horse which is involved in

---

[10] A horseman is defined:

> [A]s any individual, sole proprietorship, partnership, association, public or private corporation, in the United States or any federal agency, this state or any political subdivision of this state, and any other legal entity which engages, with or without compensation, in organizing, promoting, presenting or providing equestrian activities or in providing facilities for equestrian activities.

W. VA. CODE § 20-4-2(2). Neither party contests that the Greenbrier is a "horseman" as defined by the statute.

-7-

the equestrian activity of which the horseman knows or through the exercise of due diligence could know;

(3) Make known to any participant any dangerous condition as to land or facilities under the lawful possession and control of the horseman of which the horseman knows or through the exercise of due diligence could know, by advising the participant in writing or by conspicuously posting warning signs upon the premises;

(4) In providing equipment or tack to a participant, make reasonable and prudent efforts to inspect such equipment or tack to assure that it is in proper working condition and safe for use in the equestrian activity;

(5) Prepare and present to each participant or prospective participant, for his or her inspection and signature, a statement which clearly and concisely explains the liability limitations, restrictions and responsibilities set forth in this article.

W. Va. Code § 20-4-3.

Similarly, the Act defines the duties of each participant[11] in an equestrian activity. The duties of a participant are described as follows:

Each participant in an equestrian activity expressly assumes the risk of and legal responsibility for any injury, loss or damage to person or property which results from participation in an equestrian activity. Each participant shall have the sole individual responsibility for knowing the range of his or her own ability to manage, care for, and control a particular horse or perform a particular equestrian activity, and it shall be the duty of each participant to act within the limits of the participant's own ability, to maintain reasonable control of the particular horse or horses at all times while participating in an equestrian activity, to heed all posted warnings, to perform equestrian activities only in an area or in facilities designated by the horseman and to refrain from acting in a manner which may cause or contribute to the injury of anyone. If while actually riding in an equestrian event, any participant collides with any object or person, except an obviously intoxicated person of whom the horseman is aware, or if the participant falls from the horse or from a horse-drawn conveyance, the responsibility for such collision or fall shall be solely that of the participant or participants involved and not that of the horseman.

A participant involved in an accident shall not depart from the area or facility where the equestrian activity took place without leaving personal identification,

---

[11] It is undisputed that Plaintiff was a "participant" as defined by the Act. *See* W. Va. Code § 20-4-2(4).

-8-

including name and address, or without notifying the proper authorities, or without obtaining assistance when that person knows or reasonably should know that any other person involved in the accident is in need of medical or other assistance.

W. VA. CODE § 20-4-4.

Under the Act, a horseman will only be liable in three situations. First, a horseman is liable "for injury, loss or damage caused by failure to follow the duties set forth in section three [§ 20-4-3] of this article where the violation of duty is *causally related* to the injury, loss or damage suffered." W. VA. CODE § 20-4-5(a) (emphasis added). Second, a horseman is liable "for acts or omissions which constitute gross negligence or willful and wanton conduct which is the *proximate cause* of injury to a participant." *Id.* § 20-4-5(b) (emphasis added). Finally, a horseman is liable "for an intentional injury which he or she inflicts upon a participant." *Id.* § 20-4-5(c).[12]

The purpose of the Act is to define those areas of responsibility for which horsemen will be liable, which the legislature defined by creating affirmative duties and permitting liability for injury "causally related" to the breach of those duties. In sum, an injury to a participant sustained in an equestrian activity is an inherent risk assumed by the participant, for which a horseman has no liability, unless the participant can prove that a breach of the horseman's duties under the Act was causally related to the injury or the injury was proximately caused by the horseman's gross negligence or intentional acts.

## III.   ANALYSIS

### a.   *Count One - Negligence*

The West Virginia Equestrian Activities Responsibility Act, and it alone, establishes the tort liability for a horseman in West Virginia. *See* discussion set forth in Section II. b., *supra*. *See also*

---

[12] Plaintiff has neither claimed nor argued that the Greenbrier intentionally injured her.

W. VA. CODE § 20-4-1.  *Cf.  Lewis v. Canaan Valley Resorts,* 408 S.E.2d 634, 645 (W. Va. 1991) (noting that the West Virginia Skiing Responsibility Act does not provide an alternative remedy for the repealed common-law cause of action resulting from the inherent risks of skiing); *see also Murphy v. N. Am. River Runners*, 412 S.E.2d 504, 511 (W. Va. 1991) (explaining that the West Virginia Whitewater Responsibilities Act immunizes commercial whitewater outfitters from tort liability to participants resulting from the inherent risks).  Otherwise, the Act would be rendered useless because horsemen would still be sued under the less stringent standards of simple negligence.  Therefore, a claim of common law negligence by a participant against a horseman for injury during an equestrian activity is not recognized under West Virginia law.  Accordingly, the Greenbrier is entitled to summary judgment on Count One of Plaintiff's complaint.

### b.      *Count Two - Statutory Liability*

On the remaining counts, the Greenbrier argues that it is entitled to summary judgment for two reasons.  First, it argues that because Plaintiff "fell" off the horse, she is precluded from recovery due to the fact that she assumed the risk of such a fall by way of § 20-4-4 (duties of participants).  Specifically, the Greenbrier directs the Court's attention to the language in the statute that states, "if the participant falls from the horse . . ., the responsibility for such . . . fall shall be solely that of the participant . . . involved and not that of the horseman."  W. VA. CODE § 20-4-4.  In effect, the Greenbrier asks this Court to hold that any fall during an equestrian activity is a risk assumed by the participant and for which there can never be liability for the horseman.  Alternatively, the Greenbrier argues that even if it could be held liable for a fall, it is not liable in this case because it: (1) satisfied all the duties set forth in § 20-4-3; (2) did not cause Plaintiff's injury; and (3) did not act in a grossly negligent fashion.  The Court rejects the Greenbrier's

argument that it can never be liable for a "fall," but finds that based on the evidence in the record, any breach of the Greenbrier's statutory duties was not causally related to Plaintiff's injury. Plaintiff's claim for gross negligence also fails but will be addressed separately.

With regard to Count Two of Plaintiff's complaint, which alleges a violation of the Act, the Court disagrees with the Greenbrier's broad interpretation of the risks assumed by a participant. The mere fact that a participant falls from a horse does not insulate a horseman from liability. To hold otherwise would most often prohibit any recovery under the Act. While the Court can foresee many injuries that may occur from other causes,[13] the majority of equestrian related injuries are likely to occur as a result of a fall.[14]

Under the Greenbrier's interpretation, a participant would be barred even if the horseman patently failed to perform his required statutory duties and such a breach was causally related to the participant's injury. For example, if the Court accepts the Greenbrier's argument, a horseman could breach the duty to assure that he provides safe equipment by giving a participant a broken saddle, and if this causes the participant to *fall* off the horse, the horseman would not be liable. The duties set forth in the Act's statutory scheme clearly indicate that the West Virginia Legislature did not intend such a result. The more logical approach would be to determine first whether the horseman

---

[13] *See, e.g., Muller et al. v. English*, 472 S.E.2d 448, 450 (Ga. Ct. App. 1996) (plaintiff injured when she was kicked by defendant's horse); *Amburgey v. Sauder*, 605 N.W.2d 84, 86 (Mich. Ct. App. 1999) (plaintiff injured when bit by defendant's horse).

[14] *See, e.g.*, Caroline Finch & Graeme Watt, *Locking the Stable Door: Preventing Equestrian Injuries*, 22 SPORTS MEDICINE 187-97 (1996), *available at* http://www.monash.edu.au/muarc//reports/muarc103.pdf (citing studies that report approximately 75% of the time the "mechanism" for equestrian related injuries is a fall).

adequately performed his duties under the statute.  If he did, then the horseman would be protected from liability for a participant's fall in the absence of gross negligence or intentional misconduct.

Next, the Greenbrier argues that it did not breach any of the duties alleged by Plaintiff.  In her complaint, Plaintiff alleges that the Greenbrier breached its duty to: (1) determine the ability of the participant and horse involved in the equestrian activity; (2) make known dangerous characteristics of any horse involved in the activity; (3) present her with a statement that explained the liability limitations, restrictions, and responsibilities of the Act; and (4) inspect the equipment provided.[15]

### (1) Determination of the Ability of Participant and Horse

Section 20-4-3(1) of the Act requires a horseman to perform three acts in order to be entitled to the protection of the Act.  The horseman must first, "[m]ake reasonable and prudent efforts to determine the ability of a participant to safely engage in the equestrian activity."  W. VA. CODE § 20-4-3(1).  Second, the horseman must "determine the ability of the horse to behave safely with the participant."  *Id.*  Finally, he must "determine the ability of the participant to safely manage, care for and control the particular horse involved."  *Id.*  Because the language of the statute is conjunctive, the horseman is required to do all three, and failure to do any one is a breach of the

_____

[15] Plaintiff did not allege in her complaint that the Greenbrier failed to make known any dangerous condition as to land or facilities in its control that it knew or through the exercise of due diligence could know, by advising her in writing or by conspicuously posting warning signs upon the premises. *See* W. VA. CODE § 20-4-3(3).  Because of her failure to plead this breach through amendment or proffering evidence to support such a claim, the Court will not consider Plaintiff's argument that the Greenbrier breached this duty.  *See* FED. R. CIV. P. 15.  Pursuant to Rule 15, pleadings may be amended by leave of court or to conform with the evidence presented at trial. Plaintiff has produced no evidence that the Greenbrier knew or should have known of any dangerous conditions of the land, therefore an amendment is not warranted.

-12-

statutory duty. *Contra  Clyncke v. Waneka*, 134 P.3d 492 (Colo. App. 2005), *cert. granted*, 2006 Colo. LEXIS 488 (Colo. May 30, 2006).[16]

By the plain language of the first duty in this subsection, the Greenbrier needed to determine Plaintiff's ability to safely engage in the trail ride.  To do so, Mr. Diem could have inquired as to her riding ability prior to helping her mount her horse.  According to Plaintiff, he did not. Alternatively, Mr. Diem could have reviewed the portion of the Notice, Release and Indemnification that asked Plaintiff to describe her riding ability.  Had he looked, he would have seen she did not fill it out and could have tried to gather more information.  In order to establish that the Greenbrier met this duty, the Greenbrier suggests that Mr. Diem observed Plaintiff's "initial handling of Trump and judged her to be capable."  Evidence of this fact alone does not support a finding that the Greenbrier reasonably determined Plaintiff's ability to safely engage in the trail ride, and a genuine issue of material fact exists.

However, the Court finds that there is no issue of material fact as to whether the Greenbrier breached its duty to determine Trump's ability to behave safely with Plaintiff.  Mr. Diem's testimony establishes that Trump had been used at the Greenbrier for guest rides for approximately ten years without a guest ever being hurt. Diem Dep. at 46.  Moreover, the grooms and guides had

---

[16] The Greenbrier argues that the duties under this subsection only exist prior to the initiation of the equestrian activity. However, courts in other jurisdictions have noted that these duties are ongoing and do not end after a participant mounts his or her horse. *See Fielder v. Academy Riding Stables*, 49 P.3d 349, 352 (Colo. App. 2002) (finding that a defendant breached this duty when it became apparent that while the plaintiff was on the horse, her ability did not enable her to safely manage it); *see also Hendricks v. JAFI, Inc.*, No. 966038, 1999 WL 1336069, at *1 (Mass. Super. Jan. 20, 1999) (finding a genuine issue of material fact existed as to whether the defendant failed to make reasonable efforts to determine the plaintiff's ability between the time plaintiff mounted her horse and the accident).  Although the Court does not expressly decide this legal point, the Court has considered the events both before and after the ride began.

an informal process by which they distinguished guide horses from guest horses.  *Id.* at 18.  Once a horse was purchased, it would remain a guide horse until it was determined that the horse had enough experience to be used by guests.  *Id.*  Plaintiff has put forth no evidence to contradict these facts or create an issue of material fact as to whether the Greenbrier breached this duty.

Finally, because the Greenbrier did not determine Plaintiff's ability to safely engage in the trail ride, the Court finds that there is also a material issue of fact as to whether the Greenbrier also failed to determine Plaintiff's ability to safely manage or control her horse.  While Trump may have been safe for any individual to ride, the question of whether Plaintiff could manage or control it would be for the jury to determine.

Even though the Court concludes that there is a genuine issue of material fact as to whether the Greenbrier breached its duty under § 20-4-3(1), there is no evidence in the record to show that this breach, if any, was "causally related" to her injury.  Under the Act, the legislature distinguished the causation required for a breach of duty cause of action and a gross negligence cause of action.  A breach of the statutory duties set forth in § 20-4-3 merely requires that the injury be "causally related."  W. Va. Code § 20-4-5(a).  In contrast, the level of causation needed for a gross negligence cause of action is that of "proximate cause."  *Id.*  § 20-4-5(b).  Obviously, the legislature intended there to be two different standards of causation, or else it would have used the same language in both instances.  *See Evans v. CDX Servs.,* 2007 U.S. Dist. LEXIS 361, at *13 (S.D. W. Va. Jan. 4, 2007) (holding that differing terminology in two subsections of a statute should be read differently).  Therefore, a participant will not be held to the proximate cause standard when a horseman breaches one of the statutory duties set forth in the Act.

A precise definition of "causally related" is not found in the West Virginia case law. However, the legislature has used this same language in the West Virginia Skiing Responsibility Act. To deny summary judgment on the causation issue under the Skiing Act, the court in *Hardin v. Ski Venture*, 848 F. Supp. 58, 59 (N.D. W. Va. 1994), held that a plaintiff had set forth sufficient evidence where the plaintiff's expert witness "opine[d], by deposition and accompanying report, that the accident resulted from the making of excessively wet snow which stuck to plaintiff's goggles and obscured his vision." Furthermore, the court considered the plaintiff's expert's opinion that the defendant negligently operated its snow-making machinery, which the expert believed "may have contributed to the accident." *Id.* at 59, 60.

Unlike the plaintiff in *Hardin*, Plaintiff in this case has not produced any evidence, expert testimony or otherwise, to demonstrate that her injuries were causally related to the Greenbrier's failure to determine her ability to safely engage in the trail ride. In fact, Plaintiff testified at her deposition that she had ridden before, but with a different saddle. Rutecki Dep. at 74-75. This fact would make it difficult for any rational jury to find that the Greenbrier's breach caused Plaintiff's injury without an expert. Because Plaintiff can put forth no expert testimony to prove causation, she has failed to make a showing sufficient to establish the existence of an element essential to her case. *Celotex*, 477 U.S. at 322.

### (2) Making Known Dangerous Traits of a Particular Horse Involved in the Equestrian Activity

The Court agrees with Plaintiff that the duty to inform a participant of the dangerous traits or characteristics or any physical impairments of the horse extends to both horses involved in this incident. The Act defines an "equestrian activity" as "any sporting event or other activity involving a horse or horses . . . ." W. VA. CODE § 20-4-2(1). According to this definition, the duty to make

Plaintiff known of any dangerous traits or characteristics or any physical impairments or conditions, extended to both Plaintiff's horse and her guide's. The activity in question was the trail ride, and that ride "involved" both horses. Regardless of the Court's finding that the duty extended to both horses, however, there is no evidence of any dangerous trait or characteristic or physical impairment or condition related to either horse. In fact, Mr. Diem testified that Trump had been used for rides with guests for approximately ten years without any of them being hurt while riding the horse. Diem Dep. at 46. Also, he testified that he was unaware of any problems the guides at the Greenbrier had with Thunder. *Id.* Specifically, when asked if Thunder "was in any way an overly skittish horse or high-strung . . .", he responded, "[n]o sir, it looked like to me he was going to make a dandy." *Id.* Plaintiff has not pointed to any evidence in the record that raises an issue of material fact as to any relevant characteristic of either horse. Thus, the Greenbrier had no duty to inform Plaintiff. As the Greenbrier argued, "silence was no breach" – there was nothing to tell.

### (3) Presenting Plaintiff with a Statement of Liability Limitations, Restrictions and Responsibilities Set Forth in the Act

Contrary to Plaintiff's argument, there is no genuine issue of material fact as to whether the Greenbrier fulfilled its duty to present a statement that explained the liability limitations, restrictions and responsibilities set forth in the Act. The record reflects testimony of three Greenbrier employees who each state that it is their general practice to present customers with the Notice, Release and Indemnification and ask them to sign it. *See* Crews Dep. at 11-12; Deema Dep. at 10; Kershner Dep. at 8. In accordance with this testimony, Plaintiff stated that before she mounted her horse, the employee from behind the counter came out and asked her to sign the Notice, Release and Indemnification. Rutecki Dep. at 93. Even though Plaintiff claims the employee referred to it as a sign in sheet, the document explicitly identifies itself as "The Greenbrier Notice, Release and

Indemnification." *Id*. at 93.  Plaintiff also claims that she only saw the third page.  *Id*. at 94.  Again, even if this is true, page three of the Notice, Release and Indemnification identifies itself in the upper left corner in capital letters and says "PAGE THREE" in the upper right corner.  Def.'s Resp. to Pl.'s Supplemental Reply to Def.'s Mot. for Summ. J., at Ex. D.  In an attempt to overcome this fact, Plaintiff says that the document was on a clipboard, but could not recall if the top of the page was obscured by the clip.  *Id*. at 96.  Regardless, immediately below Plaintiff's printed name and above her signature, is a paragraph that informs her that by signing, she has read and understands the Notice, Release and Indemnification.  When asked if it was her signature that appeared on the document, Plaintiff, a practicing attorney, responded, "[t]hat is my signature." *Id*. at 99.  Therefore, the evidence tends to show that the Notice, Release and Indemnification was provided to Plaintiff for her signature, and no rational jury could determine that Plaintiff was not presented with it.

The Act and the circumstances of this case are distinguishable from the statutes and cases cited by Plaintiff in her memorandum.  For example, in *Murphy*, the defendant whitewater outfitter argued that a signed waiver relieved it from its statutory duties.  412 S.E.2d at 504, 507.  The court held that a participant could not waive the statutory rights provided to him or her under a public safety statute, and any such attempt is unenforceable on the grounds of public policy.  *Id.* at 509; *see also Johnson v. New River Scenic Whitewater Tours, Inc*., 313 F. Supp. 2d 621, 631 (S.D. W. Va. 2004) (Chambers, J.).  Here, a statement of liability limitation, restriction and responsibility is required by the Act.  The Greenbrier is not suggesting that Plaintiff should not recover simply because she signed a waiver.  Rather, it argues, and the Court holds, that it did not breach its duty to present her with the appropriate statement mandated by the Act.

Furthermore, there is no evidence that even if the Greenbrier breached this duty, the breach was causally related to Plaintiff's injuries.  In her deposition, Plaintiff merely stated that she would have "marked up" the Notice, Release and Indemnification had she read it.  Rutecki Dep. at 109.  This would have no effect on the analysis.  The Greenbrier's duty is to present the statement to the participant, and Plaintiff did not testify that she would not have participated had she read it.  There is simply no evidence suggesting any causal relationship between Plaintiff's injury and any breach of this duty.

### (4) Inspecting Equipment and Assuring it is in Proper Working Condition and Safe

Although alleged in the negligence count, Plaintiff claims that the Greenbrier "failed to provide safe and adequate equipment for riders inexperienced in 'English' riding styles."  Compl. ¶ 19.  There is no dispute that Plaintiff was provided with equipment that was in proper working condition on the day of her accident.[17]  In an attempt to overcome this fact, Plaintiff argues that the Greenbrier had a duty to provide her with additional equipment, such as a pair of riding boots, pants, or gloves.  However, Plaintiff has produced no evidence that such equipment was necessary for the ride she undertook.  The Act only requires that the horseman take reasonable measures to assure that the equipment provided is in proper working condition and safe for use.  If the Greenbrier had failed to provide Plaintiff with a piece of equipment that the Greenbrier knew or should have known Plaintiff needed in order to be safe, then there might be some basis for liability.  But Plaintiff has

---

[17] When asked by the Greenbrier to "[a]dmit that the plaintiff experienced no difficulty or trouble with the bridle, saddle, girth, stirrup and leather and irons during the trail ride at The Greenbrier on September 13, 2004," Plaintiff admitted, and added, "[b]y way of further answer, there were no malfunctions with such equipment."  Def.'s Resp. to Pl.'s Supplemental Reply to Def.'s Mot. for Summ. J., at Ex. B.  She also indicated that she was provided with a helmet that did not cause her any difficulty.  *Id.*

produced no evidence which would indicate that the she was not adequately equipped to keep her safe on the horseback ride.

Accordingly, Plaintiff has not put forth sufficient evidence to establish that any breach of the Greenbrier's statutory duties under the Act was causally related to her injury, and the Greenbrier is entitled to summary judgment with respect to Count Two of her complaint.

### c.    Count Three - Gross Negligence

Finally, Plaintiff has put forth no evidence that the Greenbrier was grossly negligent and that its gross negligence was the proximate cause of her injuries.  West Virginia law "recognizes a distinction between negligence, including gross negligence, and wilful [sic], wanton, and reckless misconduct." *Mandolidis v. Elkins Indus.*, 246 S.E.2d 907, 913 (W. Va. 1970). While "[n]egligence conveys the idea of heedlessness, inattention, [or] inadvertence,"[18] willful and wanton conduct "imports premeditation or knowledge and consciousness that injury is likely to result from the act done or from the omission to act." *Mandolidis*, 246 S.E.2d at 913 (quoting *Stone v. Rudolph*, 32 S.E.2d 742, 748 (W. Va. 1944)).  Willful and wanton are words "used to signify a higher degree of neglect than gross negligence." *Groves*, 158 S.E.2d at 713.  Therefore, gross negligence is behavior somewhere between mere inattention or inadvertence and conscious disregard that injury is likely to result from one's actions.  The West Virginia Supreme Court of Appeals has never explicitly defined gross negligence, but it has interpreted Virginia law, which repeatedly defines "gross negligence" as that degree of negligence which shows "an utter disregard of prudence, amounting to complete neglect of the safety of another, such as to be shocking to reasonable men," *Finney v.*

---

[18] *Groves v. Groves*, 158 S.E.2d 710, 713 (W. Va. 1968).

-19-

*Finney*, 125 S.E.2d 191, 193 (Va. 1962), and the "absence of slight diligence, or the want of even scant care." *Colby v. Boyden*, 400 S.E.2d 184, 189 (Va. 1991).

The language used in Virginia accurately describes behavior that falls between willful and wanton conduct and simple negligence as defined by West Virginia law.  The Court's inquiry therefore becomes whether Plaintiff has put forth sufficient evidence to create a genuine issue of material fact as to whether the Greenbrier acted with an absence of slight diligence or scant care and with an utter disregard for prudence, amounting to complete neglect for Plaintiff's safety.  *See Finney*, 125 S.E.2d at 193; *Colby*, 400 S.E.2d at 189.

Plaintiff has produced no evidence that what Mr. Diem did during her trail ride constituted gross negligence. She produced no affidavits, no deposition testimony, and no expert opinion that Mr. Diem's conduct even strayed from what was reasonable under the circumstances, let alone to such a degree as to show an utter disregard for prudence.

Further, there is nothing in the record that remotely suggests that Mr. Diem's behavior, even if it was gross negligence, proximately caused Plaintiff's injuries.  What is apparent when one reviews this case is that no one seems to know what caused these horses to behave in such an aberrant fashion.  Proximate cause in West Virginia is defined as the "last negligent act contributing to the injury and without which the injury would not have occurred."  *Spencer v. McClure,* 618 S.E.2d 451, 455 (W. Va. 2005) (citations omitted).  "'Proximate cause' must be understood to be that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained of, without which the wrong would not have occurred."  *Id*. (citations omitted). "The question of proximate cause is ordinarily a factual one," and is usually for the jury to determine "when the evidence pertaining to such issues is conflicting or where the facts, even though

undisputed, are such that reasonable men may draw different conclusions from them."  *Anderson v. Moulder*, 394 S.E.2d 61, 73-74 (W. Va. 1990).

In this case, even if the Court were to conclude that there was sufficient evidence that the Greenbrier was grossly negligent, there is no proof whatsoever in the record that Mr. Diem's actions or omissions contributed to Plaintiff's injuries, and would not have occurred absent gross negligence.  Regardless of what Mr. Diem may or may not have done, the intervening event of the inexplicable behavior of the two horses appears to be the cause of this accident.  Because of Plaintiff's failure to provide such evidence, reasonable persons would not be able to "draw different conclusions," even when viewing the evidence in a light most favorable to Plaintiff, and summary judgment is appropriate on the gross negligence count of Plaintiff's complaint.  *See Anderson*, 394 S.E.2d at 74.

## IV.    CONCLUSION

This Court echoes the words of the court in *Hommel v. Benshoff*, 682 N.Y.S.2d 546, 549 (N.Y. Sup. Ct. 1998), "there is no dispute that a horse is a powerful and sometimes unpredictable animal . . . ."  For this reason, the West Virginia Legislature enacted the West Virginia Equestrian Activities Responsibility Act with a purpose to prevent liability for risks that are nearly impossible to eliminate for those who operate equestrian businesses like the Greenbrier.  To do so, the legislature set forth duties applicable to these businesses.  The Act will protect these establishments from liability if they adhere to the duties set forth.  However, a breach of the duties that causally relates to a plaintiff's injuries will result in liability.  In this case, Plaintiff has not provided the Court with any evidence that a breach of the Greenbrier's statutory duties was causally related to her injury, nor has she made a case for gross negligence.

-21-

For the reasons stated herein, the Greenbrier's Motion for Summary Judgment [Docket 35] is **GRANTED**, and the trial date scheduled for January 17, 2007 is **VACATED**.  The Court **DIRECTS** the Clerk to remove this action from the Court's docket.  Further, the Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion to counsel of record and any unrepresented party.

ENTER:        January 16, 2007

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE